## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| IRIS CHAVEZ, as Independent Administrator of the Estate of IRENE CHAVEZ, deceased, | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Jury Trial Demanded |
| The CITY OF CHICAGO, Illinois, a municipal corporation, RICARDO MENDEZ (#18779), & JOSE GUTIERREZ (#14601), & STEPHANIE JIMENEZ (#17103), & BRYANT CHOW, & JESSE LOPEZ (#18334), & SERVANDO GOMEZ (#3058), & OFFICER WOOD, & LIEUTENANT MICHAEL MURZYN (#183), & SERGEANT ANTHONY MC GOWAN (#1816) & JOHN DOE #2 | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | |
| Defendants. | ) | |

### PLAINTIFF'S COMPLAINT

NOW COMES Plaintiff, IRIS CHAVEZ, as Independent Administrator of the Estate of IRENE CHAVEZ, by her undersigned attorneys, for her complaint against the CITY OF CHICAGO, RICARDO MENDEZ, JOSE GUTIERREZ, STEPHANIE JIMENEZ, SERVANDO GOMEZ, JESSE LOPEZ, OFFICER WOOD, LIEUTENANT MICHAEL MURZYN, SERGEANT MC GOWAN, BRYANT CHOW and JOHN DOE 2, alleges as follows:

1

**INTRODUCTION**

1.      Irene Chavez was a native Chicagoan and a queer[1]Afro-Latina woman. She was also a decorated military veteran who served time in combat zones and a beloved daughter, sister, aunt, and friend. Her loved ones remember her as smart, funny, and loving with a commitment to making the world a better place. After her honorable discharge from the military, Irene developed serious post-traumatic stress disorder ("PTSD") and struggled with alcohol dependency. Irene dreamed of healing her trauma, farming on her family land in Mexico, and traveling the world. But on December 18, 2021, the actions and inactions of Chicago Police Department (CPD) Officers and the City of Chicago's policy and practice failures cut Irene's life tragically short.

2.      On that date, CPD Officers encountered Irene outside of the Jeffery Pub, where she was in the midst of a mental health crisis. Irene had recently completed alcohol treatment and relapsed—that night she drank for the first time after being sober for a month and a half.  As a result of an alleged altercation between Irene and bouncers at the pub, CPD officers decided to arrest her on misdemeanor battery charges. Both Irene and her friend repeatedly told CPD officers that Irene was a veteran, that she had PTSD, and that she needed hospitalization. CPD officers ignored this information and failed to modify standard arrest procedures to accommodate Irene's mental health needs. Not only did CPD officers refuse to accommodate

---

[1] *What Does Queer Mean?*, Planned Parenthood, *https://www.plannedparenthood.org/learn/teens/sexual-orientation/what-does-queer-mean.*

Irene's disability during the arrest, but they intentionally escalated the situation by mocking Irene and her friend, and using foul, aggressive language.

3.      Instead of taking Irene to the hospital or otherwise securing care for her, CPD officers placed Irene in a District 3 holding cell that was not suicide proof and created a significant risk to her safety. The cell had at least two obvious suicide hazards. First, the cell had two metal bars that formed a secure protrusion from which a person could attempt self-harm. Second, the cell's large observation window was covered in paper. The paper blocked the window and prevented officers from visually observing the people detained in the cell. Even after Irene told an officer that she was not alright, CPD officers left Irene in the cell alone and took no action to protect Irene from the risk that the cell presented.

4.      Once alone in the cell, Irene repeatedly cried out for help—reasserting that she was a veteran who lived with PTSD and needed to see her therapist. Multiple CPD Officers heard Irene's cries for at least 45 minutes and each one ignored her. After Irene was quiet for a few minutes, an officer climbed on a desk to peer over the paper obscuring the window to the holding cell. The CPD officer then saw Irene slumped over with one end of her shirt tied around her neck and the other secured to the metal bar. Medical professionals removed an unconscious Irene from that cell, and she was later pronounced dead at the hospital.

5.      CPD Officers' refusal to accommodate, care for, and protect Irene does not stand in isolation. Instead, it is part of the Chicago Police Department's widespread policy and practice of 1) failing to establish adequate policies and procedures regarding CPD's interactions with people who live with mental illness and 2) failing to appropriately supervise and hold accountable officers who violate the rights of people who live with mental illness. These failures have been widely documented by the U.S. Department of Justice, the Police Accountability Task Force, and

multiple lawsuits and investigations demonstrating that CPD officers regularly escalate encounters with people living with mental illness and fail to secure them mental health services, often resulting in death and/or serious injury. The City of Chicago's deliberate indifference to this widespread policy, practice, and custom is demonstrated *inter alia* by its failures to comply with the federal consent decree intended to remedy these violations.

6. The actions of the City of Chicago and the Defendant CPD officers have created an unfillable void in the lives of the Chavez family and in the lives of all those who knew and loved Irene.

## JURISDICTION & VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1343 and 1367.

8. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

9. Irene C. Chavez, the decedent, was a thirty-three-year-old queer Afro-Latina woman who was a decorated military veteran and beloved by her family. Irene lived with PTSD, which affected her ability to work, care for herself, and maintain social interactions with others. As a result of her PTSD, Irene was a qualified person with a disability under the Americans with Disabilities Act. Plaintiff Iris Chavez is Irene's sister and the duly appointed administrator of her estate.

10. Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately

4

responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

11.     At all relevant times Individual Defendants Officers Ricardo Mendez, Jose Gutierrez, Stephanie Jimenez, Bryant Chow, Jesse Lopez, Servando Gomez, Officer Wood, John Doe #2, and CPD Supervisors Lieutenant Michael Murzyn and Sergeant Anthony Mc Gowan were employed by the Chicago Police Department and were acting under color of state law and as the employees, agents, or representatives of the City of Chicago. These Defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

## BACKGROUND INFORMATION ABOUT IRENE CHAVEZ

  

12.     Irene Carina Chavez grew up on the south-east side of Chicago loving basketball, music, and barbequing with her dad. Irene spent time playing outside with her siblings and

---

[2] Irene Chavez at age 10.
[3] Irene with her younger brother, Daniel Chavez Jr.
[4] Irene barbequing and smiling.

5

dancing in soul train lines in the living room of her home with her mother. As a child, Irene and her siblings excelled as musicians—Irene played the percussion section, her sister Iris played woodwind instruments, and her brother played the brass section. Together, they traveled across the U.S. participating in musical competitions—which they frequently won. Irene developed a love of travel while traveling with her family to musical competitions.

 

13. Irene's love for travel motivated her to join the army in 2006. She completed two tours overseas—first in Afghanistan and Kuwait, second in Korea. At various times during her deployment, Irene was stationed in combat zones where she led communications-related initiatives, including serving as a communications security manager. Irene completed both tours and returned to the U.S. as a military veteran who served her country with distinction and honor.

---

[5] Irene while overseas in the Army.
[6] Irene in full Army uniform overseas.

6

She received the Iraq Campaign Medal with two campaign stars, Army Commendation Medal, Army Achievement Medal, Meritorious Unit Commendation, Army Good Conduct Award, National Defense Service Medal, and the Global War on Terrorism Service Medal.

14.     Irene suffered at least two concussions while in the Army. After completing two tours, Irene was diagnosed with PTSD. When she returned home, the trauma that she witnessed overseas and the physical effects of her concussions took a significant toll and caused her to drink heavily. She told her sister that she did not feel normal anymore, she referred to family members and friends as "civilians" frequently, and often stated that she "felt like a robot."

15.     In the years following her discharge, Irene lived in Texas and completed paramedic courses at Central Texas College. Irene also went on a solo backpacking trip in Central America as a means to "become better." She continued to struggle with heavy drinking as she moved back to Chicago in mid-2018.  In the months before COVID-19 plagued the country, Irene became extremely reclusive, was fired from a job at Northwestern University Hospital, and became incredibly paranoid and disinterested in activities that she loved—such as playing sports with her nephews, going to the lakefront, attending LGBTQ+-centered events with friends, and volunteering at the Greater Chicago Food Depository.

7

 

16.     Irene's PTSD took a significant toll on her life activities. Irene struggled to maintain relationships with others and to care for herself. There were periods of time when family, friends, and romantic partners closest to Irene did not hear from her for several months. Irene also struggled to maintain her home and the tasks needed to care for oneself. Even when Irene had access to resources, her home often lacked essential items, such as a bed and food in her refrigerator. Irene's PTSD symptoms also prevented her from working steadily and supporting herself.

17.     On October 4, 2021, a veteran's affairs case worker created a suicide safety plan for Irene. Irene's safety plan identifies several triggers related to Irene's mental health and state of mind and documents her lack of stable housing. In the fall of 2021, Irene committed to recovering from her alcohol dependency. She successfully completed a rehabilitation program a week prior to the incident at the Jeffery Pub, but she relapsed on or around December 18th.

---

[7] Irene posing with her nephew at an event after her time in the Army.
[8] Irene posing with her mom, dad, sister, nephew, and celebrity actress Jeryl Prescott after her time in the Army.

## CPD OFFICERS UNLAWFULLY ARRESTED IRENE OUTSIDE OF THE JEFFERY PUB IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

18.     On the evening of December 18, 2021, Irene was at Jeffery Pub, an establishment commonly known as one of the only gay bars in Chicago that caters to the Black and brown LGBTQ+ community. Irene's PTSD caused her to struggle with alcohol dependency[9] and on that night, she had recently relapsed.

19.     Irene and a bouncer who worked at the bar had a conflict, and upon information and belief, the bouncer requested that CPD respond to the Pub. When CPD arrived on the scene, Irene was standing outside the bar in handcuffs. The bouncer handcuffed Irene prior to CPD's arrival and detained her outside the bar.

20.     Once CPD arrived at the scene, CPD officer body camera footage recorded the bouncer telling officers that Irene hit and spat on him because she wanted to play music on the jukebox while a DJ was playing a set, and that Irene became upset when he told her she could not play music. The bouncer also implied to the CPD officer that Irene had accused him of some type of inappropriate sexual conduct.

21.     CPD reports regarding this arrest document that the bouncer was a 350-pound male and that Irene was a 140-pound female. The bouncer told CPD officers that he was not

---

[9] *See* National Center for PTSD, *Problems with Alcohol Use*, U.S. Dept. of Veterans Affairs (2019), https://www.ptsd.va.gov/understand/related/problem_alcohol_use.asp ("People with PTSD are more likely to have drinking problems. . . . Having PTSD and alcohol use problems at the same time can make the symptoms of each worse. . . . Gender is an important factor as well. Women who have PTSD at some point in their lives are 2.5 times more likely to also have alcohol abuse or dependence than women who never have PTSD.").

injured and that he did not want to press felony charges against Irene but wanted to proceed with misdemeanor charges.

22. While the bouncer told CPD officers about the alleged misdemeanor battery, Irene repeatedly requested that the CPD officers hear her side of the story and asserted that the bouncer had harmed her. The officers refused to speak to her about what happened inside the bar and Officer Jose Gutierrez told her that "the court would sort it out."

23. Repeatedly, prior to her arrest, Irene told the CPD officers that she was a veteran and that she had PTSD. While handcuffed, Irene cried out that CPD officers were "laughing at a homeless veteran going to jail." At one point, Irene asserted to the CPD officers, "you're not helping me at all."

24. Repeatedly, prior to Irene's arrest, a friend who accompanied Irene told CPD officers that Irene had recently relapsed and needed professional medical care, not arrest. Officer Wood scoffed at Irene's friend and at one point asked, "are you the police?"

25. Prior to Irene's arrest, the alleged victim of the alleged misdemeanor battery told CPD officers that Irene "just needed a ride home."

26. Officer Ricardo Mendez was one of the first to respond to the scene and decided to arrest Irene on a charge of misdemeanor battery after taking a statement from the alleged victims. Officer Mendez heard Irene repeatedly assert that she was a veteran and that she had PTSD. He also heard her say that she needed help. Officer Mendez ignored her pleas for help and proceeded to initiate CPD's standard arrest procedures.

27. Irene, who identified as a woman, repeatedly requested that a woman search and "handle" her. She repeatedly expressed her discomfort with male officers. Eventually, Officer Stephanie Jimenez responded to the scene. She heard Irene repeatedly assert that she was a

veteran and that she had PTSD. She also heard her say that she needed help. Officer Jimenez ignored her pleas for help and proceeded to assist with CPD's standard arrest procedures by searching Irene and removing the bouncer's handcuffs and replacing them with CPD handcuffs.



28.     Officers Chow, Gutierrez, Wood, and John Doe #1 also responded to the scene. They heard Irene repeatedly assert that she was a veteran and that she had PTSD. They also heard her say that she needed help. These officers ignored her pleas for help and proceeded to

---

[10] Irene complying with Officer Jimenez' search of Irene prior to her arrest.

assist with CPD's standard arrest procedures. The Officers also witnessed Irene request that a female officer "handle her."

29.     While Irene was handcuffed and while she repeatedly asserted her PTSD diagnosis and her need for help, she became upset. During Officer Jimenez' search of Irene, Officer John Doe #1 approached and began to ask Irene questions. Irene told him to shut up and asserted that she was speaking to the "lady," in reference to Officer Jimenez. Officer John Doe #1 immediately escalated the situation by asserting "I'm talking to you!" in an aggressive, antagonizing tone. Irene told Officer John Doe #1 "fuck you." Officer Doe #1 responded with increased aggression when he screamed "go fuck yourself" directly at Irene's face, and then screamed at her "you ain't talking to me like that. I don't know who you think I am." Irene responded to the Officer with further insults. Officer Doe #1 knew or should have known that Irene was in a mental health crisis and yet escalated the situation in a threatening and aggressive manner, entirely disregarding Irene's mental health.





[11] Irene and Officer John Doe #1 at the moment he tells her "go fuck yourself."

[12] Irene, handcuffed with handcuffs belonging to the alleged victim, surrounded by Officer Jimenez, Officer Gutierrez, Officer Wood, and Officer John Doe #1, who heard Irene repeatedly assert her PTSD diagnosis and her need for help.

13

30. Officer Bryant Chow and Officer Wood transported Irene from the Jeffery Pub to District 3. They heard Irene repeatedly assert that she was a veteran and that she had PTSD. They also heard Irene's friend say that Irene had relapsed that night, and they heard Irene say that she needed help. These officers ignored Irene's pleas for help and proceeded to assist with CPD's standard arrest procedures. While restrained in the transport vehicle, Irene sang the song "You are my Sunshine" loudly and repeatedly. At one point, Irene changed the lyrics to the song and sang "please don't take my life away." Officers Bryant Chow and Wood heard Irene singing and they laughed and mocked her while they drove her to District 3.

31. The resulting arrest report indicates that CPD officers charged Irene with misdemeanor battery. In Illinois, battery is a Class A misdemeanor. The responding officers and their supervisor knew these alleged offenses were minor and that there were no exigent circumstances or immediate threats to public safety that may have prevented the officers from immediately securing mental health services for Irene or otherwise providing her with reasonable accommodations.

32. After CPD officers restrained Irene in the back of the transport vehicle, Officer Wood told Irene's friend that, because she was only being charged with a misdemeanor, CPD officers would fingerprint Irene and then release her from custody later that same night. That was the last time Irene's friend saw her alive.

33. After Irene's death, the Civilian Office of Police Accountability documented the obscured viewing area of the holding cell and instructed CPD that this practice posed a danger to people in its custody.

14

**CPD OFFICERS FAILED TO PROVIDE IRENE WITH REASONABLE
ACCOMMODATIONS, INCLUDING ALTERNATIVES TO ARREST, WHICH
WOULD HAVE ACCOMMODATED IRENE'S DISABILITIES AND SAVED HER
LIFE**

34.     The CPD officers involved in Irene's arrest should have accommodated her disability by taking actions that would have addressed the manifestations of her PTSD including, but not limited to, providing her with access to immediate mental health services, and de-escalating the situation instead of ignoring her needs and further antagonizing and taunting Irene.

35.     CPD Special Order S04-20-05, concerning "Arrestees in Need of Mental Health Treatment," provides that when CPD officers arrest an individual who is charged with a misdemeanor and who is in need of a mental health evaluation, CPD officers must transport the individual to the nearest mental health intake facility for an evaluation.[13]

36.     CPD Special Order S05-14, on the "Crisis Intervention Team (CIT) Program," states that the Department "seeks to reduce the incidence and severity of mental and behavioral health-related services calls and advocates early intervention for individuals in crisis by encouraging Department members to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options, where feasible and appropriate."[14] The policy

---

[13] Arrestees in Need of Mental Health Treatment, Chicago Police Department, Special Order S04-20-05(II)(B), http://directives.chicagopolice.org/#directive/public/6696.
[14] Crisis Intervention Team (CIT) Program, Chicago Police Department, Special Order S05-14(III)(C), http://directives.chicagopolice.org/#directive/public/6949.

goes on to describe the Crisis Intervention Unit that serves to "prevent unnecessary incarceration and/or hospitalization of individuals" living with mental illness.[15]

37.     Similarly, CPD Special Order S04-20, "Recognizing and Responding to Individuals in Crisis," declares that "The Chicago Police Department is committed to . . . training Department members in recognizing the signs and symptoms of mental illness and the statutory criteria indicating a person is in need of emergency mental health treatment"[16] and sets forth several requirements related to CPD's interactions with Irene that CPD failed to follow.

    a.  In general, the Special Order requires that "[d]epartment members will utilize their training and the following guidelines to assist in recognizing individuals in crisis and in need of intervention."[17] Moreover, it states that "[a] crisis intervention response may be necessary even in situations where there has been an apparent violation of law."[18]

    b.  More specifically, the Special Order requires department members to "be aware of verbal, behavioral and environmental cues that **could suggest** the individual is in need of mental health treatment" (emphasis in original).[19] Irene exhibited multiple of the listed cues, including "disorganized speech," "unusual demeanor," and "extreme emotional responses."[20]

    c.  The Special Order applies not only to individuals suffering from mental illnesses—such as PTSD—but also to individuals with "co-occurring conditions such as substance use disorders."[21] It defines a "substance use disorder" as "when the recurrent use of alcohol and/or drugs causes clinically significant impairment." The officers knew Irene to be under the influence of alcohol and that she had recently relapsed.[22]

    d.  The Special Order emphasizes multiple times that officers responding to situations involving persons in crisis must use de-escalation tactics. Such officers must "limit external stimuli that can agitate the individual [or] escalate the situation";[23] "establish and maintain one on one communication with the subject and avoid

---

[15] *Id.* at (IV)(C)(1)(b).
[16] Recognizing and Responding to Individuals in Crisis, Chicago Police Department, Special Order S04-20(II)(A)(5), http://directives.chicagopolice.org/#directive/public/6323.
[17] *Id.* at (V).
[18] *Id.* at (VII)(E).
[19] *Id.* at (V)(A).
[20] *Id.* at (V)(A)(1) to (3).
[21] *Id.* at (V).
[22] *Id.* at (IV)(D).
[23] *Id.* at (VII)(I)(4).

16

giving simultaneous directions or having multiple members verbally engaging the subject to avoid confusion";[24] "listen and speak in a calm and controlled tone of voice in order to gather the individual's concerns as a de-escalation strategy while helping to defuse fear, anxiety, or insecurity";[25] and "recognize [that] the person may be overwhelmed by external and internal stimuli."[26] In general, "[d]epartment members will interact with individuals in crisis with dignity and respect."[27] CPD officers violated these directives on multiple occasions in their interactions with Irene—for example, when Officer John Doe #1 screamed "go fuck yourself" directly at Irene's face and when multiple officers laughed and mocked her.

e. The Special Order requires officers responding to a situation with an individual in crisis to "request a certified CIT-trained officer to assist, if available."[28] Upon information and belief, none of the responding officers requested that a CIT-trained officer assist them, even after Irene identified herself as a person with PTSD. Moreover, the Directive provides that even if a CIT-trained officer is not available, "the responding officer will engage in crisis intervention response techniques, as appropriate and consistent with Department policy and their training, throughout the incident."[29] The responding officers failed to employ any crisis intervention response techniques when interacting with Irene.

f. Finally, the Special Order requires that "[a]t the conclusion of an incident with a mental health component, the Department member assigned to investigate the incident will . . . complete a Crisis Intervention (CIT) Report on CLEARNET."[30] Upon information and belief, none of the responding officers completed a CIT Report after Irene's arrest.

38.     Despite the aspirational language in these policies, CPD has failed to enact appropriate policies and procedures to ensure that officers have the training and resources to provide people like Irene with reasonable accommodations during arrest. Further, CPD has repeatedly failed to hold accountable and adequately supervise officers who have failed to reasonably accommodate people living with mental health issues during arrest.

---

[24] *Id.* at (VII)(I)(7).
[25] *Id.* at (VII)(I)(8).
[26] *Id.* at (VII)(I)(10).
[27] *Id.* at (VII)(D).
[28] *Id.* at (VII)(I)(3).
[29] *Id.* at (VII)(I)(3).
[30] *Id.* at (VII)(J)(3).

**CPD OFFICERS REPEATEDLY IGNORED IRENE'S PLEAS FOR HELP
AND LEFT HER ALONE IN A CELL WITH SUICIDE HAZARDS**



[31] Image of the holding cell with the horizontal bar/suicide hazard circled.



40.     Officer John Doe #2 asked Irene if she had shoelaces and/or earrings. Presumably, he made this inquiry in order to mitigate suicide risk. He also asked if Irene was okay. She answered, "no I'm not alright." Upon information and belief, Irene told Officer Doe #2 that she had PTSD and needed her therapist. The officer made no further inquiry and took no action to secure mental and/or medical care for Irene or remove her from the holding cell with suicide hazards.

---

[32] Image of the paper covering the window of the cell CPD officers placed Irene in.



41.     At some point after Officer Chow placed Irene in the holding cell, multiple officers gathered outside of the cell and sat around a table. Those officers include Officer Mendez, Officer Jimenez, Officer Gutierrez, Officer Gomez, and Officer Lopez.

42.     Irene, who was alone in the cell with the suicide hazards, repeatedly called out to these officers, telling them that she had PTSD, that she needed her therapist, and that she was a veteran. CPD incident reports affirm that Irene repeatedly called out and requested mental health services.

43.     Each of the officers in the room could hear Irene's cries but could not see her because the window was blocked. Body-worn camera footage depicts Officer Mendez, Officer

---

[33] Image of John Doe #2 telling Irene to remove her shoelaces and asking if she was okay. Irene replies that she is not okay.

Jimenez, Officer Gutierrez, Officer Gomez, and Officer Lopez talking and laughing while Irene was pleading for help.

44.     Each of the officers in the room knew that Irene was in the midst of a mental health crisis and that she was being charged with a misdemeanor offense that likely would have resulted in her release from custody at some point that evening. Each officer knew that she was in a cell with suicide hazards.  And each officer ignored Irene's cries for help and allowed her to continue to cry out.

45.     After ignoring Irene's cries for approximately forty-five minutes, Officer Gutierrez attempted to look into the cell. Because of the paper blocking his view, he had to climb on a desk to check on Irene.



[34] Image of Officer Gutierrez climbing onto the desk to look into the cell where Irene was handcuffed. Officer Lopez stepped out of the room moments prior.

46.     The CPD incident report states that Officer Gutierrez "observed Irene kneeling on the holding cell floor facing the east wall with her chest and back entirely exposed and her black button-down shirt wrapped around her neck." The other end of her shirt was wrapped around the metal bar pictured below.



47.     CPD has not publicly released any video depicting what happened to Irene between the time she was placed in the holding cell and when CPD officers found her slumped over in her cell. After they found Irene unconscious, numerous CPD officers including Officer Gutierrez attempted to render aid to Irene. She was eventually transported to the University of Chicago Hospital where medical staff pronounced her dead at 9:49am.

48.     Reasonable officers would have 1) ensured that Irene was not placed in a cell with suicide hazards; 2) responded to Irene's cries for help and requested the intervention of a mental

---

[35] Image with the metal bar around which Irene's shirt was tied circled.

health professional or transported Irene to the hospital. Had the officers taken these actions, they would have saved Irene's life.

49. CPD Supervisors Murzyn and Mc Gowan were present when officers brought Irene into custody. As supervisors, they were responsible for ensuring that people held in custody at District 3 had their medical and mental health needs met and that they were not exposed to a risk of harm.

50. CPD Supervisors Murzyn and Mc Gowan knew that Irene was in a mental health crisis and that CPD officers had placed her in a holding cell with suicide hazards. CPD Supervisors Murzyn and Mc Gowan knew that Irene repeatedly cried out for help and requested mental health services. CPD Supervisors Murzyn and Mc Gowan acted unreasonably when they failed to ensure that Irene was provided with mental health services and other interventions to mitigate her mental health crisis. CPD Supervisors Murzyn and Mc Gowan acted unreasonably when they permitted Irene to be held in a cell with suicide hazards.

51. The City of Chicago and the Chicago Police Department failed to accommodate Irene's disability by 1) failing to modify the structure of the holding cell in District 3 in order to eliminate suicide hazards and to protect people held there from the well-established risk of suicide; 2) failing to promulgate appropriate policies, procedures, training, supervision and accountability of its officers in order to ensure that they provide reasonable accommodations to people who, like Irene, are in the midst of a mental health crisis.

**CPD OFFICIALS AND THE DEFENDANT OFFICERS REPEATEDLY VIOLATED CPD POLICY AND STATE LAW DURING THEIR INTERACTIONS WITH IRENE**

52. As explained further below, CPD policy and practice failures caused Irene's injuries and led to her death. But the Defendant Officers' failure to comply with the meager and

insufficient protections provided in CPD policy and state law further demonstrates their

unreasonable actions and inactions.



24

that if an arrestee is under the influence of alcohol, CPD officers must "keep the arrestee within sight and sound" and must not "confine [them] alone." Defendant Officers violated these guidelines by failing to (1) transfer Irene to a hospital, (2) monitor her visually, and (3) by confining her alone.

53.     CPD Special Order S06-01-02, "Detention Facilities General Procedures and Responsibilities," states that when an arrestee is perceived to be "mentally/chemically impaired or suicidal," CPD officers must immediately notify the supervisor, who is required to take immediate action, which can include transport to a medical facility.[36] None of the Defendant officers took action to evaluate and/or transport Irene.

54.     CPD General Order G06-01, "Processing Persons under Department Control," provides that CPD officers are required to allow arrestees to make three telephone calls "as soon as possible" to an attorney, family member or friend."[37] Defendant Officers failed to provide Irene with her phone calls, even though contact with loved ones and/or counsel could have helped mitigate her distress.

55.     CPD General Order G06-01 also states that holding facilities must prominently display notices informing people in custody of their rights to free legal services, to communicate with friends, family and attorneys, and the rights of people accused of crimes.[38] CPD officials failed

---

[36] Detention Facilities General Procedures and Responsibilities, Chicago Police Department, Special Order S06-01-02(III)(B)(13), (III)(C)(9), https://directives.chicagopolice.org/#directive/public/6451.

[37] Processing Persons under Department Control, *Chicago Police Department*, General Order G06-01(II)(B)(2), http://directives.chicagopolice.org/#directive/public/6401. Although this citation refers to a version of General Order G06-01 that was not yet in force in December 2021, when CPD arrested Irene, upon information and belief, the quoted text either was present or was present in substantially similar form in the version of this Order current at the time.

[38] *Id.* at (II)(B)(5)(a, c).

to post rights notices in the cell in which Irene was held. Had Irene known that she had rights to communicate with an advocate and with her family—and that she would likely have been released shortly after processing—her distress may have been mitigated.

56.     CPD General Order G-06-01 operationalizes the requirements of state law and relevant portions of the Illinois Administrative Code. Specifically, § 720.20 of the code provides that people in custody "must be treated humanely and provided with proper . . . medical treatment."[39] The Administrative Code further provides that law enforcement officers who fail to ensure that a person in custody receives proper medical treatment and/or fails to ensure that a person in custody receives a phone call and/or fails to ensure that the notice of rights is posted is criminally liable for official misconduct.[40]

57.     Administrative Code § 720.30 states that ". . . a detainee who shows evidence of [a mental illness], shall be detained only temporarily in a municipal jail and transferred as soon as possible."[41] The Defendant Officers failed to transfer Irene to a mental health facility after knowing that she was in the midst of a mental health crisis.

---

[39] Ill. Admin. Code tit. 20, § 720.20(a)(3) (1998).
[40] *Id.* at § 720.20(e).
[41] *Id.* at § 720.30(c).

## THE POLICY AND PRACTICE FAILURES OF THE CITY OF CHICAGO AND THE CHICAGO POLICE DEPARTMENT LED TO IRENE'S DEATH

### THE CITY OF CHICAGO HAS LONG BEEN ON NOTICE THAT THE CPD HAS CONSTITUTIONALLY DEFICIENT POLICIES, PRACTICES AND PROCEDURES RELATING TO INTERACTING WITH PEOPLE LIVING WITH MENTAL ILLNESS

### SUICIDE IS A LEADING CAUSE OF DEATH IN LOCK-UPS, AND REASONABLE LAW ENFORCEMENT OFFICERS WOULD TAKE PRECAUTIONS TO PROTECT AGAINST THE WELL-DOCUMENTED RISK OF SUICIDE

58. All reasonable law enforcement officials know that suicide is a leading cause of death in lockups and jails and that the first few hours of detention is a particularly deadly time for people at a risk of self-harm. The Prison Policy Initiative conducted an analysis of jail suicide data taken between 2015 and 2016 and found that the vast majority of in-custody suicides take place shortly after admission.[42] A *Reuters* investigative documented that between 2009 and 2019, 7,571 in-custody suicides occurred in the United States.[43] Of those 7,571 deaths, more than 2,000 individuals were in the midst of a mental crisis when they died.[44] A 2010 study published by the U.S. Department of Justice National Institute of Corrections reported that 47% people who died in custody by suicide had a history of substance abuse.[45]

59. Suicide in custody is a tragically common occurrence in the Chicagoland area. In recent years, several detainees at Cook County Jail have also died by suicide. While CPD does not

---

[42] Bernadette Rabuy, *The Life-Threatening Reality of Short Jail Stays*, Prison Policy Initiative (Dec. 22, 2016), https://www.prisonpolicy.org/blog/2016/12/22/bjs_jail_suicide_2016/ (citing Dana Liebelson and Ryan J. Riley, *Sandra Bland Died One Year Ago*, Huffington Post (Jul. 13, 2016)), https://highline.huffingtonpost.com/articles/en/sandra-bland-jail-deaths/).
[43] Peter Eisler et al, *Why 4,998 Died in U.S. Jails Without Getting Their Day in Court*, Reuters (Oct. 16, 2020), https://www.reuters.com/investigates/special-report/usa-jails-deaths/.
[44] *Id.*
[45] Lindsay M. Hayes, *National Study of Jail Suicide: 20 Years Later*, at 1.

27

administer Cook County Jail, these well-publicized incidents provided the City of Chicago and

the CPD additional notice about the serious risk of harm suicide poses to people in custody.:

  a. On December 30, 2013, **Tyshawn Carter**, a 17-year-old detainee at Cook County Jail, died by suicide.[46]

  b. On February 5, 2015, **Jaclyn P. Clair** died at Cook County Jail of suicidal asphyxiation. CPD had arrested her 10 days previously.[47]

  c. On March 22, 2016, former Marine **Devin Lynch** died by suicide while detained at Cook County Jail.[48] Jail officials had documented Lynch's history of depression, anxiety, and PTSD, including two previous suicide attempts—the second of which occurred the day before his death.[49]

  d. On September 5, 2017, **Nathaniel Griffin, Jr.** died by suicide detained at the Cook County Jail, despite being held in the jail's supermax division.[50]

  e. On May 28, 2018, **Richard Smith** died by suicide at Cook County Jail after hanging himself with his bedsheets.[51]

  f. On August 3, 2018, **Anthony Mbanu** died by suicide while being detained at the Cook County Jail, also despite being held in the jail's supermax division.[52]

  g. On May 8, 2019, **Giovanny Gomez**, a detainee at Cook County Jail, attempted to commit suicide by hanging. Jail officers found him hanging in his supermax cell at 4pm. Mr. Gomez died from his injuries on May 13, 2019.[53]

---

[46] Naheed Rajwani, *Officials: Inmate, 17, Hangs Himself at Cook County Jail*, Chicago Tribune (Dec. 30, 2013), https://www.chicagotribune.com/news/breaking/chi-cook-county-jail-suicide-tyshawn-carter-20131230-story.html.

[47] Liam Ford, *Officials Probe Death of Woman at Cook County Jail*, Chicago Tribune (Feb. 6, 2015), https://www.chicagotribune.com/news/breaking/chi-cook-county-jail-death-20150205-story.html.

[48] Liam Ford, *Autopsy: Sexual Assault Suspect Hanged Himself in Cook County Jail*, Chicago Tribune (Mar. 23, 2016), https://www.chicagotribune.com/news/breaking/ct-sex-assault-suspect-hangs-himself-20160323-story.html.

[49] Douglas Ankney, *Cook County, Illinois to Pay $1.7 Million for Former Marine's Suicide in Jail*, Prison Legal News (Oct. 7, 2019), https://www.prisonlegalnews.org/news/2019/oct/7/cook-county-illinois-pay-17-million-former-marines-suicide-jail.

[50] *Detainee Dies of Apparent Suicide at Cook County Jail*, Chicago Sun-Times (Sept. 6, 2017), https://chicago.suntimes.com/2017/9/6/18396730/detainee-dies-of-apparent-suicide-at-cook-county-jail.

[51] Madeline Buckley, *23-Year-Old Man Dies by Suicide in Cook County Jail*, Chicago Tribune (May 28, 2018), https://www.chicagotribune.com/news/breaking/ct-met-jail-suicide-20180528-story.html.

[52] *Detainee Dead of Apparent Suicide at Cook County Jail*, Fox 32 Chicago (Aug. 3, 2018), https://www.fox32chicago.com/news/detainee-dead-in-apparent-suicide-at-cook-county-jail.

[53] *Detainee Dies Days after Suicide Attempt at Cook County Jail*, Chicago Sun-Times (May 14, 2019), https://chicago.suntimes.com/crime/2019/5/14/18626939/detainee-dies-days-after-suicide-attempt-at-cook-county-jail.

h. On July 2, 2019, **Patrick Tullis** died by suicide while detained in Cook County Jail. He hung himself about a week after CPD arrested him while on parole.[54]

i. On May 21, 2020, **Trumell K. Holmes** died by suicide while detained at the Cook County Jail.[55]

60.     Despite this institutional knowledge about the serious risk of harm that suicide poses to people in custody, and the need to accommodate standard procedures to accommodate the needs of people who live with mental illness, CPD has inadequate official and *de facto* policies, procedures, and practices regarding suicide prevention and the provision of mental health services to people in need. Further, CPD fails to provide adequate training in suicide prevention and fails to hold accountable officers who violate policy and law regarding suicide prevention and the provision of mental health services to people in mental health crisis.

61.     Over the last four decades, multiple people in CPD custody died by suicide and upon information and belief, hundreds of people have succeeded in seriously harming themselves while in CPD custody, thus effectively putting the City on notice that the CPD lacked appropriate policies, procedures, and practices to adequately protect arrestees from the risk of suicide. These incidents include, but are not limited to, the following deaths by suicide while in CPD custody:

a. On November 29, 1987, **Anthony Wesley, Jr.** died by suicide by hanging while in CPD custody after being arrested for disorderly conduct. Mr. Wesley was

---

[54] Deanese Williams-Harris, *Man on Parole for Double Murder Found Hanged to Death in Jail Cell after Arrest on Gun Charges*, Chicago Tribune (Jul. 3, 2019), https://www.chicagotribune.com/news/breaking/ct-parolee-hanged-jail-cell-20190703-xixadelo3bfe7mwza4xfuybh2q-story.html.

[55] Rosemary Sobol, *Family Distraught after Officials Say Cook County Jail Detainee Died by Suicide*, Chicago Tribune (May 23, 2020), https://www.chicagotribune.com/news/breaking/ct-jail-inmate-suicide-20200523-edr22vwccbgrffbbhmqhlvpcka-story.html.

intoxicated at the time of his arrest and screamed at various times while in custody.[56]

b. On February 12, 1994, **Mildred Williams** died by suicide by hanging while in CPD custody. Mr. Williams told officers several times that he was feeling extremely anxious and depressed and that he felt suicidal. Despite these statements, CPD did not monitor Mr. Williams while he was in custody.[57]

c. On September 26, 1999, **Armando Reyes** died by suicide by hanging while in CPD custody. Mr. Reyes was kept in custody for more than thirty-six hours without being charged and was left in a cell out of view from officers and without a functioning camera.[58]

d. On October 23, 1999, CPD officers arrested **Melvin Bradich** when he left his home after consuming high amounts of heroin and alcohol. Officers knew that Mr. Bradich was addicted to heroin and forced him to make several phone calls in an attempt to create cases against other drug users. After these phone calls, CPD officers took Mr. Bradich to the police station, at which point he was extremely intoxicated and emotionally distraught. Without providing medical care, officers left Mr. Bradich in his cell alone, where he died by suicide by hanging.[59]

e. On or about November 12, 2000, CPD officers arrested **J.C. Reed**. Mr. Reed told the jail officers that he was claustrophobic and suicidal. Mr. Reed attempted to harm himself in front of those officers by slitting his wrists. CPD also knew, owing to a prior arrest of Mr. Reed, that his mental illness was severe. Nevertheless, and despite placing him on suicide watch, CPD put Mr. Reed in the furthest possible cell from the observation area and neglected to check on him for substantial periods of time. With CPD failing to check on him, Mr. Reed died by suicide by hanging himself in his cell using his isolation gown.[60]

f. On April 16, 2010, **Oliverio Saucedo** died by suicide by hanging while in CPD custody after being held in a windowless interrogation room by himself. Mr. Saucedo repeatedly showed signs that he was a risk to himself before his suicide.[61]

g. On November 16, 2011, **Develt Bradford** was arrested by police and interrogated throughout the early hours of the morning. Throughout the day, Mr. Bradford indicated to CPD officers, although he did not explicitly state, that he was not

---

[56] Brooks v. City of Chicago, No. 88-C-8609, 1992 WL 373034, at *2 (N.D. Ill. Dec. 8, 1992).

[57] Williams v. City of Chicago, No. 94-C-3350, 1995 WL 88926, at *1 (N.D. Ill. March 2, 1995).

[58] Clara v. City of Chicago, No. 99-C-7052, 2002 WL 1553419, at *4–5 (N.D. Ill. July 15, 2002).

[59] Complaint at ¶¶ 5–6, Bradich v. City of Chicago, No. 00-CV-7998, 2004 WL 406779 (N.D. Ill. Feb. 19, 2004).

[60] Third Am. Complaint at ¶¶ 13–20, Reed v. City of Chicago, No. 01-C-7865, 2002 WL 32679185 (N.D. Ill. Nov. 12, 2002).

[61] Second Am. Complaint at 5, Saucedo v. City of Chicago, No. 11-CV-5868 (N.D. Ill. June 11, 2015).

doing well mentally. That evening, Mr. Bradford was charged and informed that his hearing would be the next day. In the middle of the night, CPD officers found Mr. Bradford hanging from a bar in his cell. Mr. Bradford was pronounced dead by suicide.[62]

h. On November 20, 2011, CPD arrested **Melvin C. Woods, Jr.** and took him to a CPD station. While there, Mr. Woods told several officers that he was going to kill himself and attempted to strangle himself with his pants in front of CPD officers. CPD officers removed all his clothing except his underwear and left him in a cell alone with a camera that CPD knew to be dysfunctional. Mr. Woods was later found hanging from a bar in his cell by his underwear. He was declared dead at the scene. CPD later settled with Mr. Woods' family.[63]

i. On September 12, 2013, **Okoi Ofem** died by suicide by hanging after being held in CPD custody for almost twenty-four hours. Mr. Ofem had refused food throughout his time in CPD custody but did not explicitly state that he was feeling suicidal.[64]

j. On August 18, 2016, police arrested **Tyler Lumar** on an out-of-county traffic warrant after he caused a disturbance in a medical clinic. After fraudulently telling Mr. Lumar that he was ineligible for bail, Mr. Lumar became extremely anxious and asked for medical treatment. Officers took him to the hospital but returned him to the police station immediately after. Upon Mr. Lumar's return, police officers falsely accused him of having drugs in his possession. Mr. Lumar then told police he was suicidal, but officers left him alone and did not perform the required checks at fifteen-minute intervals. Mr. Lumar was later found hanging in his cell.[65] He suffered massive brain injuries and spent the rest of his life in a long-term care facility, where he died two years later.[66]

62. The City of Chicago's deliberate indifference to the risk of harm people with mental illness face as a result of CPD's deficient policies, practices, and procedures is also demonstrated by the significant harm people with mental illness have experienced when they

---

[62] Bradford v. City of Chicago, No. 16-CV-1663, 2021 WL 1208958, at *2–3 (N.D. Ill. March 31, 2021).

[63] Complaint at 2–3, Woods v. City of Chicago, No. 16-CV-1671, 2016 WL 11702225 (N.D. Ill. Dec. 23, 2016).

[64] Lapre v. City of Chicago, No. 15-C-3199, 2017 WL 4005922, at *1 (N.D. Ill. Sept. 12, 2017).

[65] Am. Complaint at 9–16, Alcorn v. City of Chicago, 336 F.R.D. 440 (N.D. Ill. 2020) (No. 17-CV-5859).

[66] Jeremy Gorner, *Man Dies After Alleged Mixup Led to His Wrongful Arrest, Attempted Hanging and Massive Brain Injuries*, Chicago Tribune (Apr. 19, 2018 9:35 AM), https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-lockup-death-20180418-story.html.

encounter CPD officers on the street. CPD officers regularly escalate encounters with people living with mental illness through taunts and foul language, fail to secure mental health services for people in obvious crisis and, as a result, people with mental illness often end up dead or seriously harmed after encountering a CPD officer. Examples of these incidents include:

    a. In May 2006, police arrested **Christina Eilman**, a woman with bipolar disorder. Despite clear indications that Ms. Eilman was in the midst of a manic episode, and after being told multiple times that she had bipolar disorder, police did not provide her with any medical treatment and released her in an area of Chicago with which she was unfamiliar. Later that day, Ms. Eilman was sexually assaulted and fell out of a seventh story window, suffering paraplegia and permanent brain damage.[67]

    b. On February 28, 2007, CPD shot and killed **Raul Barriera**, a young Latino man with schizophrenia, after he barricaded himself in his bedroom and refused to come out. Mr. Barriera's mother called the police because she feared Mr. Barriera would harm himself and warned police of his mental health concerns. CPD tased Mr. Barriera twice before shooting and killing him.[68]

    c. On December 28, 2007, CPD shot and killed **Ted Hernandez**, a man with mental illness, when he was on the roof of his residence and holding a knife.[69]

    d. On July 24, 2012, an officer initiated a fight against an unidentified intoxicated man in custody, where the officer viciously beat and choked the man, threw him into multiple cells, and left the man handcuffed to a cell for several hours.[70]

    e. On Dec. 13, 2012, **Phillip Coleman**, a 38-year-old man experiencing a psychotic breakdown, died, after police "tased him several times before and after he arrived at the hospital," then gave him a sedative.[71]

    f. On June 16, 2014, police tackled and arrested **Shwan Yawer**, a Kurdish man, for burglary when Mr. Yawer was attempting to prove to police that his name was on the lease for the apartment he was supposedly burglarizing. Mr. Yawer told police he had anxiety and depression before having a panic attack, at which point police slammed Mr. Yawer to the ground, cutting his head, and dragged him down the stairs by his feet.[72] Mr. Yawer later died by suicide as a result of this incident.[73]

---

[67] Complaint at 3–8, Paine v. City of Chicago, No. 06-C-3173, 2006 WL 3065515 (N.D. Ill. Oct. 26, 2006).

[68] Complaint at 2–3, Wilson v. City of Chicago, No. 07-C-1682, 2008 WL 4874148 (N.D. Ill. July 24, 2008).

[69] Am. Complaint at 1–2, Hernandez v. City of Chicago, No. 16-C-8875, 2016 WL 6948386 (N.D. Ill. Nov. 28, 2016).

[70] Log# 1055807, Civilian Office of Police Accountability, https://www.chicagocopa.org/wp-content/uploads/2017/04/1055807-REDACTED.pdf.

[71]  Adeshina Emmanuel and Suzanne McBride, *Police Face Choice of Handcuffs or Helping Hand for Mentally Ill*, Chicago Reporter (Apr. 30, 2015), https://www.chicagoreporter.com/police-face-choice-of-handcuffs-or-helping-hand-for-mentally-ill/.

[72] Complaint at 4–5, Yawer v. City of Chicago, No. 16-cv-4956, 2019 WL 1200778 (N.D. Ill. Mar. 14, 2019).

[73] McGregor for Estate of Yawer v. City of Chicago, No. 16-C-4956, 2020 WL 10110999 (N.D. Ill. July 8, 2020).

g.  On June 21, 2014, an officer punched an intoxicated man in the face and pushed him to the floor after the man used racial slurs against the officer.[74]

h.  On July 30, 2014, police stopped **Kurtis Garrett** and determined he needed a mental health evaluation. While forcibly carrying Mr. Garrett into the squadrol, officers hit Mr. Garrett's face on the door of the car, causing several injuries requiring medical treatment.[75]

i.  On January 12, 2015, CPD tackled, punched, and arrested **Clyde Earl**, a man with schizophrenia who was in the midst of a mental health crisis, when he was on a CTA bus attempting to get to the hospital to obtain medical treatment. Mr. Earl informed CPD that he was experiencing a crisis and needed treatment both before and after arrest. CPD held Mr. Earl for two days and refused to provide him with a mental health evaluation or medication despite his pleas for help.[76]

j.  On May 3, 2015, officers stopped **Miguel Gama** who appeared to be intoxicated. Officers tackled him to the ground and put their weight on him until he complained of loss of breath and was in distress. Mr. Gama was transferred to the hospital due to his loss of breath. During booking, officers again tackled Mr. Gama and kneed him in the face. Mr. Gama again required medical treatment in the hospital for his injuries.[77] On July 20, 2015, **Heriberto Godinez** died in police custody while his head and feet were held down by police. Police observed that he was intoxicated at the time of his death.[78]

k.  On December 26, 2015, CPD killed **Quintonio LeGrier**, a 19-year-old engineering student experiencing a mental health crisis, after responding to LeGrier's own 911 call requesting assistance.[79] The police also killed neighbor Bettie Jones, 55, when she came to the front door to help.[80] According to a subsequent U.S. Department of Justice report, this episode "laid bare failures in CPD's crisis response systems."[81]

l.  On April 7, 2016, police tased, maced, tackled, handcuffed, and shackled **Walter Gunn**, who was suspected of committing a burglary, after witnessing Mr. Gunn

---

[74] Log# 1069929, Civilian Office of Police Accountability, https://www.chicagocopa.org/wp-content/uploads/2016/10/Log1069929-REDACTED.pdf.

[75] Log# 1070681, Civilian Office of Police Accountability, https://www.chicagocopa.org/case/1070681-2/.

[76] Am. Complaint at 2–5, Earl v. Espejo, No. 17-C-195, 2017 WL 3704826 (N.D. Ill. Aug. 28, 2017).

[77] Log# 1074984, Civilian Office of Police Accountability, https://www.chicagocopa.org/case/1074984-2/.

[78] Log# 1076214, Civilian Office of Police Accountability, https://www.chicagocopa.org/case/1076214-2/.

[79] Jeremy Gorner and Annie Sweeney, *Quintonio Legrier Called 911 Three Times before a Chicago Cop Shot Him*, Chicago Tribune (Jan. 26, 2016), https://www.chicagotribune.com/news/breaking/ct-quintonio-legrier-bettie-jones-911-calls-met-20160125-story.html

[80] *Id.*

[81] *Investigation of the Chicago Police Department*, Dept. of Justice (Jan. 13, 2017), at 37, https://www.justice.gov/opa/file/925846/download [hereinafter "DOJ Report"].

claim to be the "god of death." The owner of the residence later confirmed that Mr. Gunn had a history of mental illness.[82]

m.  On August 7, 2016, officers dragged **Alan Shields** through a small doorway to handcuff him after Mr. Shields lit his shirt on fire. Mr. Shields required medical attention for his injuries.[83]

n.  In February 2017, police tased, then shot and killed, **Michelle Robey** after she exhibited signs of acute mental health crisis in a CVS and later on a Chicago Transit Authority bench.[84]

o.  On August 13, 2017, police shot **Ricardo ("Ricky") Hayes**, a Black 19-year-old man with developmental disabilities. Ricky had left home and was reported missing by his caretaker, and he was seen skipping down the street later by neighbors. An off-duty police officer chased Ricky in his truck before shooting him in his chest and arm. CPD settled the case.[85]

p.  On December 27, 2017, police officers roughly handcuffed and pushed two children with autism, **F.S.** and **JA.S.**, while executing a search warrant. Before entering the home, officers were notified that there were children inside with intellectual disabilities, but they made no attempt to accommodate the children's disabilities.[86]

q.  On January 6, 2019, CPD officers physically subdued and arrested a man who was allegedly causing a "mental health disturbance." The autopsy showed that one of the contributing factors leading to his death was the stress caused by being physically restrained.[87]

r.  On January 29, 2019, police officers punched, tased, and kneeled and stepped on **D.H.**, a sixteen-year-old Black girl with an emotional disability, after she fell down the stairs while being escorted out of school due to using her phone in class.[88]

s.  On January 4, 2020, the police killed **Tyree Davis**, a bipolar 26-year-old man. CPD was informed that Davis "may have mental problems"; nevertheless, the officers threatened him with guns and tasers, ultimately shooting and killing Davis as he attempted to run away.[89]

t.  On May 7, 2019, CPD officers responded to a call regarding a mental health disturbance at a gas station. When they arrived, a man attempted to run past the

---

[82] Log# 1080018, Civilian Office of Police Accountability, https://www.chicagocopa.org/case/1080018-2/.

[83] Log# 1080871, Civilian Office of Police Accountability, https://www.chicagocopa.org/case/1080871/.

[84] Am. Complaint at 3, Robey v. City of Chicago, No. 17-CV-2378, 2018 WL 688316 (N.D. Ill. Feb. 2, 2018).

[85] Complaint at 1–2, Hayes v. City of Chicago, No. 18-CV-5515 (N.D. Ill. Aug. 13, 2018).

[86] Complaint at 3–4, Serrano et al. v. City of Chicago, No. 18-CV-2191 (N.D. Ill. March 27, 2018).

[87] Log #1092233, Civilian Office of Police Accountability (document provided by FOIA request).

[88] Complaint at 3–4, 6, Howard v. City of Chicago, No. 19-CV-1281 (N.D. Ill. Feb. 20, 2019).

[89] William Lee and Deanese Williams-Harris, *Troubled by Mental Illness, Tyree Davis Was Arrested More than 50 Times over 9 Years. New Video Shows His Last, Deadly, Encounter with Chicago Police*, Chicago Tribune (Mar. 6, 2020), https://www.chicagotribune.com/news/breaking/ct-police-fatal-shooting-video-20200306-vlfzpaxw7zh57k7pmbz63azm5m-story.html.

officers and the officers tackled and arrested the man. While the officers handcuffed the man, the man struggled, and officers held him down by his legs and shoulders. The man became unresponsive and officers took him to the hospital. The man subsequently died in custody due to cocaine use and stress caused by officers' use of physical restraint on him.[90]

u. On November 23, 2019, CPD officers arrested a man who arrived at lockup with visible signs of trench foot or frostbite. While in custody the man defecated into his own clothing and displayed difficulty walking. CPD gave him no medical attention until the next morning, when he collapsed after being transferred to the courthouse. He died that evening. In its report, COPA found numerous failures of CPD officers to provide adequate care for this man, who was quite possibly experiencing a mental health crisis; additionally, COPA found that several officers later gave intentionally false or misleading statements to investigators.[91]

v. On February 28, 2020, CPD officers "harassed, chased, tackled, pepper-sprayed, tasered, and shot" **Ariel Roman**, a Latino man, after he crossed between two CTA train cars in the midst of an anxiety attack.[92]

w. On May 2, 2020, CPD officers attempted to apprehend a woman with schizophrenia and bipolar disorder who was reported to be outside without adequate clothing, carrying a knife, and attacking people and vehicles with a broom. After tasing the woman, the officers handcuffed her and transported her to a hospital for a mental health evaluation, where she died the following morning, "possibly due to cardiac arrest."[93]

x. On May 5, 2020, CPD SWAT officers responded to a call of a man armed with a knife having a mental health crisis. The officers negotiated with the man, who began to self-harm by cutting himself. After five hours he stabbed himself in the chest several times, at which point the officers fired a beanbag round and two tasers at him. The man attempted to flee, but CPD apprehended him and eventually transferred him to a hospital, where he later died. The death was ruled a suicide.[94]

---

[90] Log# 2019-0001143, Civilian Office of Police Accountability (document provided by FOIA request).
[91] Log# 2019-0004789, Civilian Office of Police Accountability (document provided by FOIA request).
[92] Complaint at 1–2, Roman v. Bogard, No. 20-CV-1717 (N.D. Ill. March 11, 2020).
[93] Log# 2020-0001712, Civilian Office of Police Accountability (document provided by FOIA request).
[94] Log# 2020-0001717, Civilian Office of Police Accountability (document provided by FOIA request).

63.     These repeated incidents demonstrate that CPD has a pattern and practice of responding to people in a mental health crisis with indifference to their lives and that the City of Chicago has been deliberately indifferent to these constitutional violations.

64.     CPD's current official and *de facto* policies, procedures, and practices regarding protecting people with whom CPD interacts and who are in the midst of a mental health crisis and/or at a high risk of suicide are constitutionally deficient because they:

   a. fail to sufficiently ensure that an officer who is certified in Crisis Intervention Training responds to all incidents involving someone in crisis;
   b. allow a person in a mental health crisis to be placed in a cell alone with suicide hazards;
   c. fail to hold officers to a standard of policing that prioritizes de-escalation when a person is in a mental health crisis;
   d. fail to adequately mandate with sufficiently strong language when CPD officers are required to secure mental health services for an individual in crisis;
   e. fail to adequately hold accountable officers who have violated the law and/or CPD policy and created risks of serious harm to people living with mental illness.

**THE POLICE ACCOUNTABILITY TASK FORCE AND THE U.S. DEPARTMENT OF JUSTICE DOCUMENTED CPD'S UNCONSTITUTIONAL POLICIES AND PRACTICES REGARDING INTERACTING WITH PEOPLE WHO LIVE WITH MENTAL ILLNESS**

65.     In addition to the above-mentioned incidents, several government reports have put CPD on notice that their treatment of people in mental health crises is deficient:

   a. In 2016, Chicago's own Police Accountability Task Force ("PATF") released a report on CPD practices after police fatally shot Laquan McDonald.[95] The PATF found that CPD escalates trauma at crime scenes, creating worse outcomes for

---

[95] *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve*, Police Accountability Task Force (April 2016), https://igchicago.org/wp-content/uploads/2017/01/PATF_Final_Report_4_13_16-1.pdf [hereinafter "PATF Report"].

those present when the police arrive.[96] Additionally, despite CPD's CIT unit, the PATF found that only a quarter of calls identified as mental-health related were handled by officers trained by CIT.[97] Further, CPD significantly hindered its CIT program by only having four full-time members attached to the CIT unit.[98] The PATF recommended that CPD increase its number of CIT officers, include behavioral health providers for mental-health related 911 calls, and invest in Crisis Stabilization Units for people who need mental health support but do not meet the requirements for hospitalization.[99]

b.  In 2017, the U.S. Department of Justice ("DOJ") released a report highlighting issues it found throughout CPD's practices.[100] The report found that CPD uses force against people in a mental or behavioral health crisis where force is unnecessary or avoidable.[101] Further, there were multiple instances where police used excessive force against people in a mental health crisis when no crime had been committed and officers were not threatened by the individual.[102] The report found that many of CPD's uses of force in these incidents were unconstitutional.[103]

c.  The Report specifically highlighted the shooting deaths of Quintonio LeGrier and Bettie Jones, described above, as an example of CPD's failure to handle mental health crises appropriately. In this tragic incident, police responded to a domestic disturbance and multiple levels of CPD failed to recognize that the call involved someone in a crisis.[104] Dispatchers failed to recognize someone was in a crisis, no officers with crisis training were dispatched, officers on the scene failed to use any crisis intervention techniques, and officers made basic tactical errors.[105] As a result, Quintonio and Bettie, a bystander unrelated to the incident, were both killed at the hands of CPD.[106] After this incident, the City announced some reforms for crisis intervention, but the DOJ Report explicitly found that these meager reforms were not enough to protect people facing a mental health crisis.[107] The DOJ Report noted that CPD's crisis intervention team completely lacked adequate support, and

---

[96] *Id.* at 127.
[97] *Id.* at 121.
[98] *Id.*
[99] *Id.* at 121–25.
[100] DOJ Report.
[101] *Id.* at 37.
[102] *Id.* at 44.
[103] *Id.* at 37.
[104] *Id.* at 37–38.
[105] *Id.*
[106] *Id.* at 38.
[107] *Id.*

only had three people running the program by that point.[108] Further, CPD did not have enough officers trained in crisis intervention, did not adequately screen officers who were trained in crisis intervention, and had no effective system to evaluate the quality of crisis intervention responses.[109] The DOJ Report made abundantly clear that, without new action, CPD's crisis intervention would continue to be woefully inadequate.

## CPD'S FAILURES TO COMPLY WITH THE CONSENT DECREE

66.      In 2019, after decades of violations of statutory and constitutional law, CPD and the City of Chicago entered into a Consent Decree with the State of Illinois. Several of the provisions of the Consent Decree specifically provide remedies for CPD's unconstitutional policies, practices, and procedures related to policing people living with mental illness. These provisions require:

   a. That CPD officers "interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis." And a commitment from the City and CPD "to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis."[110]
   b. The development of a Crisis Intervention Team Program (CIT Program).[111] The CIT Team is responsible for overseeing CPD officers response to people in crisis, in order to *inter alia*, improve CPD's competency and capacity to effectively respond to individuals in crisis, de-escalate crisis, improve the safety of officers and individuals in crisis, promote community-oriented solutions to assist individuals in

---

[108] *Id.* at 38–39.

[109] *Id.* at 39–40; *see also id.* at 153–54.

[110] Illinois v. City of Chicago, No. 17-CV-6260 (N.D. Ill. 2019) (Consent Decree) [hereinafter "Consent Decree"] at ¶¶ 85-86, http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[111] Consent Decree at ¶¶ 87-125.

crisis, and reduce the need for individuals in crisis to have further involvement with the criminal justice system.[112]

c. That at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis.[113]

d. That "CPD policy will encourage officers to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options. . ."[114]

67. In the latest report from CPD's Consent Decree Independent Monitoring Team (IMT), the IMT observed that CPD "has yet to finalize numerous policies under the Consent Decree review process, the finalization of which is required for Preliminary compliance. In addition, both the CPD and the City have not provided a finalized CIT Officer Implementation Plan or a finalized Crisis Intervention Plan."[115]

68. The IMT reports that CPD is not even in preliminary compliance with 22 out of the 60 paragraphs of the Consent Decree relating to the CIT program; further, CPD is only in preliminary compliance with 24 of the 60 paragraphs, and is in full compliance with merely 2 of the 60 paragraphs.[116] The City missed two out of four deadlines related to these provisions.[117] Further, the IMT notes that the "Crisis Intervention Teams would still benefit from additional staff."[118]

---

[112] Consent Decree at ¶ 88.
[113] Consent Decree at ¶ 106.
[114] Consent Decree at ¶ 134.
[115] Illinois v. City of Chicago, No. 17-CV-6260 (N.D. Ill. 2019) (Independent Monitoring Report 4) [hereinafter "IMT Report 4"] at 176, https://cpdmonitoringteam.com/wp-content/uploads/2021/10/2021_10_08-Independent-Monitoring-Report-4-filed.pdf.
[116] IMT Report 4 at 173–266.
[117] *Id.*
[118] *Id.* at 32.

69.     According to a IMT survey, only 29% of Chicagoans believe that CPD treats "people with mental health conditions" fairly.[119] This was the second-lowest response category, behind only homeless persons (27%).[120]

70.     Even though the Consent Decree contains a number of provisions that should have remedied the policy and practice violations described in this Complaint that led to Irene's death, as described fully above, CPD has failed to conform its practices to Consent Decree mandates.

## CPD'S FAILURE TO DISCIPLINE OFFICERS WHO VIOLATE THE RIGHTS OF PEOPLE WHO LIVE WITH MENTAL ILLNESS

71.     CPD has maintained a widespread practice of failing to discipline and/or hold accountable Chicago police officers that lie or remain silent about police misconduct—including discriminatory policing.[121]

72.     CPD trains its officers to incorporate a "code of silence" into their policing. One officer testified to being told repeatedly at the academy that "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."[122]

---

[119] IMT Report 4 at 119.
[120] IMT Report 4 at 119.
[121] DOJ Report at 75–77.
[122] Spalding v. City of Chicago, 186 F. Supp. 3d 884, 902 (N.D. Ill. 2016).

40

73. In *Obrycka v. City of Chicago*, No. 07-CV-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

74. In a 2015 speech to Chicago alderpersons, Mayor Emanuel acknowledged that the CPD uses a "code of silence" to conceal abuses and wrongdoing by their colleagues. In April 2016, the PATF found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."[123]

75. The DOJ investigation confirmed that the code of silence pervades CPD. The report states that the "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."[124] One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street."[125] The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.[126]

76. The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying."[127]

---

[123] PATF Report at 70.
[124] DOJ Report at 8.
[125] *Id.* at 75.
[126] *Id.*
[127] *Id.*

77. Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty. From 2007 to 2015, more than 1,500 Chicago police officers acquired ten or more Complaint Registers ("CRs"). Sixty-five of these officers had 30 or more CRs. These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers. They also underreport the problem. While CPD collects data on officer performance, including complaints and lawsuits, the reported data is often incomplete, and analysis is limited.[128]

78. Although a number of Consent Decree provisions aim to eliminate the code of silence and improve officer accountability, CPD has failed to comply with most of these terms. The City has failed to reach preliminary compliance with the vast majority of provisions related to accountability. [129]

79. CPD's failures relate directly to the Defendant Officers' actions and inactions. CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers. Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence. These policies, practices, and customs directly contributed to the code of silence and allowed the Defendant Officers to believe that they could abuse Irene with impunity.

## IRENE'S DAMAGES

80. By reason of the above-described acts and omissions of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, and John Doe #2, Irene

---

[128] PATF Report at 12.
[129] IMT Report 4 at 661.

Chavez suffered injuries, including but not limited to, the loss of her life, humiliation and indignities, and suffered great mental and emotional pain in a damages amount to be ascertained.

81.     The aforementioned acts of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, and John Doe #2 were willful, wanton, malicious, oppressive, and done with reckless indifference to and/or callous disregard for the rights of Irene Chavez and justify the awarding of exemplary and punitive damages in the amount ascertained according to proof at the time of trial.

**COUNT I**
**AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. § 12131**
**Against the City of Chicago for Failing to Accommodate Irene's Disabilities During the Arrest**

82.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

83.     Count I is alleged against Defendant City of Chicago.

84.     Irene Chavez was a qualified person with a disability because she lived with a mental illness, namely PTSD, that affected one or more major life activities.

85.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

86.     The regulations implementing Title II of the ADA provide that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

87.     In violation of Title II of the ADA, The City of Chicago and the Chicago Police Department Officers discriminated against Irene Chavez when it failed to accommodate her disability by denying her reasonable accommodations during her arrest as fully detailed above and when it failed to adequately train and supervise CPD officers regarding how to respond to situations involving people who have mental illness.

## COUNT II

### AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. § 12131
**Against the City of Chicago for Failing to Accommodate Irene's Disabilities Once She Was in CPD Custody and Detained in District 3**

88.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

89.     Count II is alleged against Defendant City of Chicago.

90.     Irene Chavez was a qualified person with a disability because she lived with a mental illness, namely PTSD, that affected one or more major life activities.

91.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

92.     The regulations implementing Title II of the ADA provide that:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration – (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3).

44

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

93. In violation of Title II of the ADA, The City of Chicago and the Chicago Police Department Officers discriminated against Irene Chavez when it failed to hold her in a cell free from suicide hazards as fully detailed above and when it failed to adequately train and supervise CPD officers regarding how to respond to situations involving people who have mental illness.

94. The City has been deliberately indifferent to the obvious discrimination of CPD officers and the need for more and different policies, practices, and procedures to prevent the violation of the rights of individuals with mental illness.

## COUNT III
### 42 U.S.C. § 1983—MONELL LIABILITY
### Against the City of Chicago

95. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

96. Count III is alleged against Defendant City of Chicago.

97. The Defendant Officers acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the Chicago Police Department, to violate Irene Chavez rights as set forth above.

98. The City of Chicago, through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated unconstitutional *de facto* policies, practices, and customs which include, *inter alia*:

     a. **Defective existing policies**. The policies, procedures, and practices for protecting people with whom CPD interacts and who are in the midst of a mental health crisis and/or at a high risk of suicide are constitutionally deficient because they:

45

      i. fail to sufficiently ensure that an officer who is Certified in Crisis Intervention Training responds to all incidents involving someone in crisis;

      ii. allow a person in a mental health crisis to be placed in a cell alone with suicide hazards;

      iii. fail to hold officers to a standard of policing that prioritizes de-escalation when a person is in a mental health crisis;

      iv. fail to adequately mandate with sufficiently strong language when CPD officers are required to secure mental health services for an individual in crisis;

      v. fail to adequately hold accountable officers who have violated the law and/or CPD policy and created risks of serious harm to people living with mental illness.

b. **Defective physical structures**. The City of Chicago has failed to modify the structure of the holding cell in District 3 in order to eliminate suicide hazards and to protect people held there from the well-established risk of suicide.

c. *De facto* **policies and procedures and customs**. The City of Chicago has promulgated, encouraged, and enforced *de facto* policies, procedures and customs that encourage CPD officers to disregard the mental health needs of people living with mental illness and engage in affirmatively harmful practices, such as denying adequate mental health care to people in mental health crisis and affirmatively escalating encounters with people living with mental illness in violation of their Fourth Amendment Rights.

d. **Failure to supervise and hold officers accountable.** The City of Chicago has failed to promulgate and enforce the appropriate training, supervision, and accountability of its officers in order to ensure that they respect the rights of people who, like Irene, are in the midst of a mental health crisis and live with mental health issues.

99. The City of Chicago is well aware of the risk of harm faced by people who live with mental illness and who have encounters with the Chicago Police Department. Yet, the City has failed to enact and enforce changes to the CPD sufficient to protect the rights of people living with mental illness. Thus, CPD has demonstrated a pattern of deliberate indifference to this harm.

**COUNT IV**
**Failure to Provide Mental Health Services**
**42 U.S.C. § 1983—4ᵗʰ AMENDMENT FAILURE TO PROVIDE ADEQUATE MENTAL HEALTH SERVICES TO IRENE WHILE SHE WAS DETAINED**
**Against Officers Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, John Doe #2 and CPD Supervisors Murzyn and Mc Gowan.**

46

100. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

101. Count IV is against Officers Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, and John Doe #2. Count IV is also against Lieutenant Murzyn and Sergeant Mc Gowan.

102. On the night of Irene Chavez's death, Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, and John Doe #2 repeatedly heard Irene request mental health services and assert that she was a veteran who lived with PTSD. These Defendants were put on notice that Irene Chavez suffered from a mental health condition and had a serious medical need.

103. Defendants CPD Supervisors Murzyn and Mc Gowan were present when Irene was brought into custody. As supervisors, they were responsible for ensuring that people held in custody at District 3 had their medical and mental health needs met and that they were not exposed to a risk of harm.

104. Defendants CPD Supervisors Murzyn and Mc Gowan knew that Irene was in a mental health crisis. CPD Supervisors Murzyn and Mc Gowan acted unreasonably when they failed to ensure that they provided Irene with mental health services and other interventions to mitigate her mental health crisis.

105. Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, John Doe #2, Murzyn, and Mc Gowan, failed to take any reasonable steps to provide Irene Chavez with mental health services or other interventions that would have mitigated the risk of self-harm. Instead, they repeatedly ignored and/or allowed the Defendant Officers to ignore Irene's cries for help.

106. These Defendants' actions and inactions were objectively unreasonable and resulted in the death of Irene Chavez.

47

## COUNT V
## 42 U.S.C. § 1983—4TH AMENDMENT UNREASONABLE CONDITIONS OF CONFINEMENT
## Against Officers Mendez, Gutierrez, Jimenez, Gomez, Lopez, Wood, Chow, and John Doe # 2 and CPD Supervisors Murzyn and Mc Gowan

107. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

108. Count IV is against Officers Mendez, Gutierrez, Jimenez, Gomez, Lopez, Wood, Chow, and John Doe # 2. Count IV is also against Lieutenant Murzyn and Sargeant Mc Gowan.

109. These Defendant Officers knew that Irene lived with PTSD, that she was a veteran, and that she was in the midst of a mental health crisis.

110. These Defendant Officers placed and/or allowed Irene Chavez to be placed in a cell with multiple suicide hazards

111. In the hours before Defendants found Irene Chavez unconscious, these Defendants knew that Irene was in the midst of a mental health crisis.

112. These Defendant Officers' failure to remove or require the removal of Irene Chavez from the cell with suicide hazards was objectively unreasonable.

113. Irene Chavez repeatedly called out for help and asserted her mental health needs. These Defendant Officers' decision to ignore and/or allow these pleas for help to be ignored is objectively unreasonable.

114. CPD Supervisors Murzyn and Mc Gowan were present when Irene was brought into custody. As supervisors, they were responsible for ensuring that people held in custody at District 3 had their medical and mental health needs met and that they were not exposed to a risk of harm.

115. CPD Supervisors Murzyn and Mc Gowan knew that Irene was in a mental health crisis and officers had placed her in a holding cell with suicide hazards. They knew that Irene repeatedly cried out for help and mental health services. CPD Supervisors Murzyn and Mc Gowan acted unreasonably when they permitted Irene to be held in a cell with suicide hazards.

116. These Defendants' actions and inactions were objectively unreasonable and resulted in the death of Irene Chavez.

## COUNT VI
## ILLINOIS STATE LAW—WRONGFUL DEATH—WILLFUL AND WANTON DENIAL OF MEDICAL CARE
### Against Mendez, Gutierrez, Jimenez, Gomez, Lopez, Murzyn, Mc Gowan, and the City of Chicago

117. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

118. This Count is against Defendants Mendez, Gutierrez, Jimenez, Gomez, Lopez, Murzyn, Mc Gowan, and the City of Chicago through its agents and employees.

119. The acts and omissions of these Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. These Defendants knew that harm would result from their actions and omissions, and they recklessly disregarded the consequences of those acts and omissions. They did so by ignoring Irene Chavez's need for mental health services and ignoring her pleas for help when she was housed in a cell with suicide hazards.

120. As a direct result of their willful and wanton conduct, Irene Chavez suffered injuries including death.

121. The City of Chicago is liable to Plaintiff for the acts of Defendants Mendez, Gutierrez, Jimenez, Gomez, Lopez, Murzyn, Mc Gowan, and its agents and employees pursuant to the doctrine of *respondeat superior.*

122.     Iris Chavez, on behalf of the next-of-kin (including herself) claims damages for the wrongful death of Irene Chavez, and for their loss of her services, protections, care, future income, assistance, society, companionship, comfort, guidance, counsel, and advice, as well as damages for their mental health, anguish caused by this loss, as well as for funeral and other expenses and damages pursuant to 740 ILCS 180/1, commonly referred to as the Illinois Wrongful Death Act.

**COUNT VII**
**ILLINOIS STATE LAW—WILLFUL AND WANTON DENIAL OF MEDICAL CARE—SURVIVAL ACTION**
**Against Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago**

123.     The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

124.     The acts and omissions of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, knew that harm would result from their actions and omissions, and they recklessly disregarded the consequences of those acts and omissions. The misconduct of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, was undertaken with intentional disregard for Irene Chavez's rights.

125.     As a direct result of the willful and wanton conduct of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the

City of Chicago, through its agents and employees, Irene Chavez suffered great conscious pain and suffering prior to her death.

126. The City of Chicago is liable to Plaintiff for the acts of Defendant Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and its agents and employees pursuant to the doctrine of *respondeat superior*.

127. Irene Chavez filed no action during her lifetime, but under the laws of the State of Illinois, this action survives and may be asserted by her Estate.

128. Iris Chavez, in her capacity as Administrator of the Estate of Irene Chavez, claims damages for the conscious pain and suffering of Irene Chavez, pursuant to 755 ILCS Section 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT VIII
### ILLINOIS STATE LAW—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS—SURVIVAL ACTION
### Against Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago

129. The allegations set forth above are realleged and incorporated by reference as if fully set forth herein.

130. In the manner described above, Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, by denying Irene Chavez medical attention, engaged in extreme and outrageous conduct.

131. In the manner described above, Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, by intentionally disregarding Irene Chavez's pleas about her medical

51

condition and need and by placing her in a holding room with the windows obstructed from view, engaged in extreme and outrageous conduct.

132. The actions of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, were undertaken with the intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

133. The actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others.

134. As a direct and proximate result of the willful and wanton conduct of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and the City of Chicago, through its agents and employees, Irene Chavez suffered injuries including severe emotional distress, and great conscious pain and suffering prior to her death.

135. The City of Chicago is liable to Plaintiff for the acts of Defendants Mendez, Gutierrez, Jimenez, Chow, Gomez, Lopez, Wood, Murzyn, Mc Gowan, John Doe #2, and its agents and employees pursuant to the doctrine of *respondeat superior*.

136. Irene Chavez filed no action during her lifetime, but under the laws of the State of Illinois, this action survives and may be asserted by her Estate.

137. Iris Chavez, in her capacity as Administrator of the Estate of Irene Chavez, claims damages for the conscious pain and suffering of Irene Chavez, pursuant to 755 ILCS 5/27-6, commonly referred to as the Illinois Survival Act.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court enter judgment in their favor against the Defendants in the following manner:

1. Award Plaintiff compensatory and punitive damages.

2. Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §
   1988.

3. Award Plaintiff such other and further relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiff demand trial by jury.

**February 22, 2022**                              Respectfully Submitted,

                                                  /s/ Sheila A. Bedi
                                                  Sheila Bedi
                                                  Community Justice and Civil Rights Clinic
                                                  Northwestern Pritzker School of Law
                                                  375 E. Chicago Ave., 8th Floor
                                                  Chicago, IL 60611
                                                  Phone: 312-503-2492
                                                  sheila.bedi@law.northwestern.edu

                                                  /s/ Andrew M. Stroth
                                                  Andrew Stroth
                                                  Action Injury Law Group, LLC
                                                  191 N. Wacker Drive, Suite 2300
                                                  Chicago, Illinois 60606
                                                  Phone: 844 878 4529
                                                  astroth@actioninjurylawgroup.com

                                                  /s/ Kara Crutcher
                                                  Kara Crutcher
                                                  *Elizabeth Ames
                                                  **Adrienne Ou
                                                  **Tom Butcher
                                                  Community Justice and Civil Rights Clinic
                                                  Northwestern Pritzker School of Law
                                                  375 E. Chicago Ave., 8th Floor
                                                  Chicago, IL 60611
                                                  Phone: 773-575-9010

kara.crutcher@law.northwestern.edu
*Law student license pursuant to Illinois Supreme
Court Rule 711
** Law student